IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS J. CIPOLLA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 05-934 |
| | ) |
| JO ANNE B. BARNHART, | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, Thomas J. Cipolla, seeks judicial review of a
decision of defendant, Jo Anne B. Barnhart, Commissioner of
Social Security ("the Commissioner"), denying his application for
disability insurance benefits ("DIB") under Title II of the
Social Security Act, 42 U.S.C. §§ 401-433. Presently before the
Court are the parties' cross-motions for summary judgment
pursuant to Fed.R.Civ.P. 56. For the reasons set forth below,
the parties' cross-motions will be denied and the case remanded
to the Commissioner for further proceedings.

## II. Background

### A. Procedural History

Plaintiff filed an application for DIB on July 14, 2003, alleging disability since February 7, 2001 due to brain stem cavernoma, dizziness, double vision, jerks, right-side numbness and spatial disorientation.[1]  (R. 49-51, 59).  Following the denial of plaintiff's application on September 19, 2003, he requested a hearing before an Administrative Law Judge ("ALJ"). (R. 37-42).  At the hearing, which was held on July 7, 2004, plaintiff, who was represented by counsel, and a vocational expert ("VE") testified.  (R. 305-33).

On August 13, 2004, the ALJ issued a decision denying plaintiff's application for DIB.  (R. 23-28).  Specifically, the ALJ concluded that plaintiff retained the residual functional capacity ("RFC") to perform work at any exertional level which does not require exposure to hazards, such as heights, dangerous

---

[1] In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1).  A claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

2

machinery and driving,[2] and that, based on the testimony of the VE, there were a significant number of jobs in the national economy which plaintiff could perform. (R. 27-28, Finding Nos. 6 and 11). Plaintiff requested review of the ALJ's decision (R. 14-19); however, the request was denied by the Appeals Council on May 3, 2005. (R. 6-8). This appeal followed.

## B. Facts

At the hearing before the ALJ on July 7, 2004, plaintiff testified as follows:

Plaintiff's date of birth is November 10, 1961.[3] He is married and resides with his wife and mother. With regard to education, plaintiff has a degree in physics. (R. 310-11).

Plaintiff has been diagnosed with a brain stem angioma which causes constant numbness on the right side of his face and in his right hand and arm, although the numbness does not prevent him from doing anything. (R. 312, 315). Plaintiff also experiences brief blackouts which are accompanied by "real hard body jerks,"[4] and double vision which persists for 20 to 30 minutes, at a rate

---

[2]RFC is the most a disability claimant can still do despite his or her limitations. 20 C.F.R. § 404.1545(a).

[3]Plaintiff was 42 years old at the time of the hearing before the ALJ.

[4]With respect to his blackouts and the danger they present, plaintiff testified that in 1999 or 2000, when he was still a member of the United States Air Force, he blacked out on the way to work and drove his vehicle into a ditch. (R. 313, 323).

3

of approximately 10 to 15 times per week.  (R. 313-15, 322).
Plaintiff also suffers from constant spatial disorientation which
makes him "very dizzy."[5]  (R. 317-19).

Plaintiff's symptoms began in 1998.  Three years later, he
received an administrative discharge from the United States Air
Force due to his medical condition because it prevented him from
doing his job.[6]  (R. 320-21).  Plaintiff has been told that there
are no medications which will relieve his symptoms, and that, due
to the location of the lesion on his brain stem, he is not a
candidate for surgery unless the condition becomes life-
threatening.  (R. 315, 325).

Plaintiff spends most of his days watching television.  (R.
316).  He is afraid to drive a car or mow the lawn because of his
condition.  (R. 317).  He also has problems with heights because
of his condition.  (R. 318).

---

[5]Plaintiff described spatial disorientation as "zoning out"
or feeling as if everything is "not focused."  Plaintiff contends
that his spatial disorientation is more of an impediment to
driving a motor vehicle than the blackouts because the spatial
disorientation is constant, while the blackouts are intermittent.
(R. 317).

[6]Specifically, plaintiff testified that the double vision
prevented him "from doing anything;" that he missed work due to
hospitalizations; and that he was unable to travel to and from
work on his own.  (R. 321).

4

## C. Evidence from the United States Air Force, Treating Sources and State Agency Physicians

The administrative record in this case contains the following evidence:

### 1. Medical Records of Robins Air Force Base - 8/7/98

Plaintiff was seen at the Robins Air Force Base Family Practice Clinic on August 7, 1998, complaining of five days of persistent numbness on the right-side of his face and in his right hand. The plan for plaintiff included an MRI of the head and ultrasound and Doppler imaging of the carotid arteries bilaterally. (R. 148).

### 2. Records of Department of Veterans Affairs - 8/19/98 to 8/21/98

On August 19, 1998, plaintiff was admitted to the hospital for a cerebral angiogram in connection with his complaints of right-side facial numbness and numbness in his right hand. The angiogram showed no aneurysm and no active AVM (arteriovenous malformation). The hospital's discharge summary indicates that an outside MRI showed signs of a right-sided cavernous angioma. Plaintiff was informed of the "extremely high risk" of surgery and the benign course of cavernous angiomas, and he was instructed to have regular follow-up MRI scans. (R. 266).

5

**3. Records of Department of Veterans Affairs - 2/18/99**

On February 18, 1999, plaintiff underwent another MRI of the brain. The findings were consistent with a cavernous angioma involving the left mid-brain posteriorly. (R. 271-72). On the same day, plaintiff was seen by Dr. Ellen Shaver for a follow-up visit in connection with his brainstem cavernoma. Dr. Shaver noted that for 3 to 4 months, plaintiff had been experiencing "intermittent symptoms of 'zoning out' on [a] daily basis for seconds to [a] minute but can continue activity." (R. 295).

**4. Records of Department of Veterans Affairs - 8/26/99**

On August 26, 1999, plaintiff underwent another MRI of the brain which showed "[n]o significant interval change from February 18, 1999 in overall appearance of the hypointense left cerebral peduncular lesion, which is consistent with a cavernous angioma." (R. 269-70).

**5. Records of Department of Veterans Affairs - 8/3/00**

On August 3, 2000, plaintiff completed a Report of Medical Assessment for the United States Air Force in which he was asked, among other things, whether he had any conditions which limited his ability to work in his military specialty or required geographic or assignment limitations. Plaintiff responded affirmatively, stating: "The cavernous hemangioma causes numbness of right side, short periods of double vision and lightheadedness close to point of blackout." (R. 299).

6

**6. Records of Department of Veterans Affairs - 8/31/00**

On August 31, 2000, plaintiff underwent another MRI of the brain which showed "[n]o significant interval change in overall appearance of the cavernous angioma noted within the left cerebral peduncle from previous study of August 26th, 1999." (R. 267-68).

**7. Request for Neurology Consultation - 12/21/00**

On December 21, 2000, the Family Practice Clinic at Robins Air Force Base submitted a request for a neurology consultation on plaintiff's behalf in connection with his history of a cavernous angioma within the left cerebral peduncle. The consultation request indicates that in addition to right-sided facial numbness and numbness in his right hand, plaintiff also experienced intermittent loss of vision. (R. 97).

**8. Report of Maher Astwani, M.D. - 1/9/01**

Plaintiff was referred by the United States Air Force to Dr. Maher Astwani of the Magnolia Medical Center, P.C. for evaluation of his right-side facial numbness and intermittent diplopia (double vision), and the evaluation was performed on January 9, 2001. Plaintiff denied progression of his symptoms, indicating that he had spells lasting a few seconds "maybe once every couple of days" where he felt his body jerking, but that no altered mental status or confusion was associated with the spells. Dr. Astwani noted that plaintiff's neurological examination showed,

7

among other things, that his cranial nerves II-XII were intact;
that his muscle strength was 4/5 throughout; that his gait was
steady; and that his Romberg's sign was negative. Dr. Astwani's
impression was "cavernous hemangioma," and he described
plaintiff's overall prognosis as "guarded." Dr. Astwani noted
that plaintiff seemed "to be doing reasonably well," and that no
further action was needed at that time due to the "critical
location of the lesion." (R. 284).

**9. Robins Air Force Base Medical Evaluation Board - 1/23/01**

Plaintiff underwent a medical evaluation for the United
States Air Force on January 23, 2001 for "persistent right-sided
facial numbness and right arm numbness which has been constant
for the past 3 years with intermittent loss of vision, dizziness
and syncopal episodes." The evaluation report describes
plaintiff's neurological examination as follows: "Cranial nerves
II-XII are intact, gait is normal, negative Romberg, finger to
nose intact, toe/heel walking is normal, strength in the
extremities is equal bilaterally, DRTs +2/4 and equal bilaterally
in the extremities. There is some decreased sensation along the
mandibular line and in the right arm."

With respect to laboratory and x-ray data, the evaluation
report states: "Multiple MRIs have shown a cavernous angioma in
the left cerebellar peduncle measuring 8.0 mm in diameter." As
to recommendations, the evaluation report indicates that

8

plaintiff was advised (a) to stop smoking; (b) not to operate a motor vehicle due to the intermittent loss of vision; and (c) to avoid aspirin products and anti-inflammatory medication. Finally, the evaluation report states: "Surgical options per neurosurgery and neurologist are none due to the location of this lesion."[7]   (R. 94-95).

## 10.  Records of Department of Veterans Affairs - 2/7/01

On February 7, 2001, Major Jacqueline R. Jackson, United States Air Force Commander, prepared a statement regarding plaintiff's Medical Evaluation Board.  In response to a question concerning plaintiff's ability to perform his duty requirements as a result of his illness, Major Jackson stated: "When symptoms occur, Major Cipolla is unable to perform any duty requirements due to his condition.  He is not available for TDYs (temporary duty) because of concerns for driving vehicles, vision problems, and blackouts.  Additionally, he lacks concentration due to preoccupation with his condition."

In response to a question concerning the frequency with which plaintiff missed work because of his medical condition, Major Jackson stated that plaintiff missed "[n]umerous days."

---

[7]The report of the evaluation indicates that plaintiff had been seen in the Neurosurgery Clinic of the VA Hospital in Augusta, Georgia by Dr. Ellen Shaver, and that Dr. Shaver advised against surgical treatment due to the location of plaintiff's lesion.   (R. 94).

Finally, in response to a question concerning how plaintiff's "return to duty" would affect the mission of the United States Air Force, Major Jackson stated: "In its dormant stage, the medical condition does not limit physical capability; however, when the illness occurs, [plaintiff] is hospitalized or on quarters. Under this condition, he would not be able to support the mission of HQ AFRC or the USAF. He is not world wide deployable, is unavailable for duty on numerous occasions, should not go TDY, and based on vision problems associated with his condition, he is often transported to and from work by co-workers. (R. 278-79).

**11. Report of Daniel L. Barrow, M.D. - 2/14/01**

On February 14, 2001, Dr. Daniel Barrow of The Emory Clinic, Inc., prepared a report of his consultative examination of plaintiff regarding management of his brainstem cavernous malformation, which was performed at the request of the United States Air Force. Dr. Barrow noted, among other things, that since plaintiff's diagnosis of a small lesion in the left side of the midbrain, plaintiff had experienced intermittent brief episodes of diplopia (double vision) and an increase in the duration of numbness in the right side of his face and right arm; that plaintiff had experienced no motor symptoms, dys-coordination or cranial nerve abnormalities; and that plaintiff had excellent strength in his upper and lower extremities. Dr.

10

Barrow "strongly advised against surgical intervention given the
small size of the malformation and the minimal symptoms," and he
recommended a follow-up MRI of the brain in August. (R. 283).

**12. Findings and Recommended Disposition of USAF Physical
Evaluation Board - 3/12/2001**

On March 12, 2001, based on his medical evaluation,
plaintiff was determined to be "unfit because of physical
disability" to serve in the United States Air Force, and he was
administratively discharged after 16 years and 2 months of
service. (R. 280-81).

**13. Report of Elliot Michel, M.D. - 8/27/03**

On August 27, 2003, plaintiff underwent a consultative
examination by Dr. Elliot Michel at the request of the
Pennsylvania Bureau of Disability Determination. With respect to
the history of plaintiff's condition, Dr. Michel noted
plaintiff's diagnosis of a cavernous angioma on the left cerebral
peduncle, and plaintiff's complaints of (a) right face and arm
numbness, (b) spatial disorientation (vision out of focus), (c)
occasional sudden body jerks, (d) intermittent double vision, and
(e) feeling dazed.

As to plaintiff's physical examination, Dr. Michel noted
that plaintiff's gait, station, visual fields and cranial nerves
(except for soft touch on the right arm and face) were intact;
that plaintiff's finger-to-nose test, fine motor movements and

11

Romberg testing were done well; and that plaintiff's handgrips were normal. Dr. Michel's impression was described as "[b]rainstem angioma with neurologic residual of paresthesias and occasional myoclonic jerks, origin undetermined," and the doctor indicated that plaintiff's prognosis was "for symptoms to persist." (R. 255-56).

Dr. Michel completed a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities in which he indicated that plaintiff had no limitations with regard to lifting, carrying, standing, walking, sitting, pushing and pulling, postural activities and other physical functions, and that plaintiff had no environmental restrictions. (R. 257-58).

**14. Residual Physical Functional Capacity Assessment - 9/9/03**

On September 9, 2003, a state agency physician completed an assessment of plaintiff's residual physical functional capacity based on a review of his file, indicating that plaintiff has no exertional, manipulative or communicative limitations; that plaintiff can frequently engage in all postural activities with the exception of climbing ladders and scaffolds which he should avoid due to his history of myoclonic jerks; and that plaintiff should avoid all hazards, *i.e.*, machinery, heights, etc., due to his history of myoclonic jerks. (R. 259-64).

12

**15.  Letter of Benjamin Shtrahman, M.D. - 9/14/04[8]**

Plaintiff was referred by Joseph E. Calhoun, Jr., D.O., his

family physician, to Dr. Benjamin Shtrahman for evaluation of

dizziness.  Following the evaluation, Dr. Shtrahman sent the

following letter to Dr. Calhoun:

Dear Dr. Calhoun,

I had the opportunity to see Mr. Cipolla for evaluation of
dizziness.  As you know, patient is a 42-year-old, right-
handed, white male who in 1998 developed acute onset of
right-sided numbness affecting the face and arm with
associated spinning sensation, double vision and off balance
sensation.  Several days later, he started to experience
generalized myoclonic jerks associated with questionable
blacking-out for a "split second."  Because of these jerks,
patient was involved in a motor vehicle accident in 1999.
After the onset of patient's posterior circulation symptoms,
he was seen at Augusta, Georgia VA Medical Center and
subsequently transferred to Emerald (sic) University
Hospital.  MRI at that time revealed a cavernous angioma.
Patient states that his symptoms have persisted, along with
intermittent exacerbation of dizziness.  Last exacerbation
took place about a week ago.  No new focal neurological
symptoms have been observed.  Current frequency of
generalized myoclonic jerks is anywhere from one to four
jerks per day, four to five days per week.  Patient's other
medical problems including (sic) hypertension and
hypercholesterolemia.

Neurological examination revealed decrease in pinprick
involving the right side of the face and arm, along with
dysmetria with finger to nose and heel to shin on the right
side.  Mild gait instability was noted during tandem gait
testing.  Recent open MRI of the brain did reveal findings
consistent with a cavernous angioma involving the left and
mid aspect of the mid brain.

---

[8]Dr. Shtrahman's letter, which was dated September 14, 2004,
was attached to the request for review of the ALJ's decision
which was submitted by plaintiff's counsel to the Appeals Council
on October 8, 2004.  (R. 15-19).

The risk of hemorrhage is low; specifically, about .5% per
year. However, because of patient's age and location of the
lesion, I suggested that patient followup with Dr. Dade
Lunsford for possible gamma knife treatment. My other
recommendation is tight control of blood pressure and
avoidance of blood thinning medications. I spoke to patient
and his wife regarding possible treatment options for the
generalized myoclonic jerks. However, patient states since
he is not driving and not working at this point, he does not
want to start ·daily medications. Since he still has his
Pennsylvania driver's license, I will have to report him to
the Department of Driver's Licensing. For intermittent
flare-ups of patient's vestibular symptoms, I have
prescribed Phenergan.

I appreciate the referral. I will see patient back as
needed.

Sincerely,
Benjamin Shtrahman, M.D.

(R. 18-19).

**16. Form Completed by Benjamin Shtrahman, M.D. for the**

**Pennsylvania Department of Transportation - 2/2/05[9]**

On October 13, 2004, plaintiff was notified that the

Pennsylvania Department of Transportation had received

information that he may have a neurological disorder which

affected his ability to drive, and plaintiff was instructed to

have the enclosed form completed by his health care provider. On

February 2, 2005, Dr. Shtrahman completed the form, indicating

that he had seen plaintiff on September 13, 2004 and February 2,

---

[9]This exhibit was submitted to the Appeals Council after
plaintiff's request for review of the ALJ's decision, and the
Appeals Council made the exhibit part of the record on March 17,
2005, in conjunction with its initial denial of plaintiff's
request for review. (R. 13).

14

2005; that plaintiff was significantly impaired with regard to "[c]oordination of movement of the extremities;" that he prescribed Phenergan for plaintiff's dizziness; and that plaintiff was not physically competent to operate a motor vehicle because he suffers from generalized myoclonic jerks on a near daily basis.[10] (R. 301-03).

### 17. Letter of L. Dade Lunsford, M.D. - 2/14/05[11]

On February 14, 2005, Dr. L. Dade Lunsford performed a consultative examination of plaintiff at the request of Dr. Calhoun, plaintiff's family physician. Dr. Lunsford noted that plaintiff continued "to be bothered by myoclonic jerking accompanied by lightheadedness and imbalance," and that plaintiff had not experienced any "new headache, numbness, diplopia, or increased worsening of his imbalance or coordination problems." Dr. Lunsford opined that plaintiff's risk of rebleeding was less than 1% and that plaintiff's lesion was not amenable to surgical intervention because of its location. Dr. Lunsford recommended a

_____

[10]Regarding the myoclonic jerks, Dr. Shtrahman noted that plaintiff "was involved in a MVA (motor vehicle accident) in 1999 because of these jerks." (R. 303).

[11]The Appeals Council initially denied plaintiff's request for review of the ALJ's decision on March 17, 2005. On May 3, 2005, the Appeals Council notified plaintiff that it was setting aside its earlier action to consider this additional exhibit. However, after consideration of the exhibit, the Appeals Council again denied plaintiff's request for review of the ALJ's decision. (R. 6-9).

repeat MRI scan in August, 2006, unless plaintiff experienced

some intervening worsening of his symptoms.  (R. 304).

## III.  **Legal Analysis**

### A.  **Jurisdiction and Standard of Review**

The Court has jurisdiction of this appeal under 42 U.S.C.

§ 405(g), which provides that an individual may obtain judicial

review of any final decision of the Commissioner by bringing a

civil action in the district court of the United States for the

judicial district in which the plaintiff resides.

The Court's review of the Commissioner's decision is limited

to determining whether the decision is supported by substantial

evidence, which has been described as "such relevant evidence as

a reasonable mind might accept as adequate to support a

conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).

It consists of something more than a mere scintilla, but

something less than a preponderance.  Dobrowolsky v. Califano,

606 F.2d 403, 406 (3d Cir.1979).  Even if the Court would have

decided the case differently, it must accord deference to the

Commissioner and affirm the findings and decision if supported by

substantial evidence.  Monsour Medical Center v. Heckler, 806

F.2d 1185, 1190-91 (3d Cir.1986).

### B. **The 5-Step Sequential Evaluation Process**

In Burnett v. Commissioner of Social Security Admin., 220

F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure

16

an ALJ must follow in evaluating a claim for Social Security
disability benefits, stating in relevant part:

\*   \*   \*

In Plummer, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity.  20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287,
2290-91, 96 L.Ed.2d 119 (1987).  In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment.  20 C.F.R.
§ 404.1520(c).  If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work.  20 C.F.R. § 404.1520(d).  If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five.  Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work.  20 C.F.R.
§ 404.1520(d).  The claimant bears the burden of
demonstrating an inability to return to her past
relevant work.  Adorno v. Shalala, 40 F.3d 43, 46 (3d
Cir.1994).

If the claimant is unable to resume her former
occupation, the evaluation moves to the final step.  At
this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability.  20 C.F.R. § 404.1520(f).
The ALJ must show there are other jobs existing in
significant numbers in the national economy which the
claimant can perform, consistent with her medical
impairments, age, education, past work experience, and

17

> residual functional capacity. The ALJ must analyze the
> cumulative effects of all the claimant's impairments in
> determining whether she is capable of performing work
> and is not disabled.

Plummer, 186 F.3d at 428.

\*   \*   \*

220 F.3d at 118-19.

With respect to the ALJ's application of the five-step
sequential evaluation process in the present case, steps one and
two were resolved in plaintiff's favor: that is, the ALJ found
that plaintiff had not engaged in substantial gainful activity
since his alleged onset date of disability, and that plaintiff
suffers from a brain stem angioma with myoclonic jerks, an
impairment which is severe within the meaning of the Social
Security Regulations.  (R. 24).  Turning to step three, the ALJ
found that plaintiff's impairment was not sufficiently severe to
meet or equal the requirements of any impairment listed in
Section 11.00 of Part 404, Subpart P, Appendix 1 of the Social
Security Regulations, relating to neurological impairments  (R.
24-25).  As to step four, the ALJ found that plaintiff cannot
perform his past relevant work as a military officer in light of
his RFC.  (R. 26).  Finally, regarding step five, based on the
testimony of the VE, the ALJ found that, considering plaintiff's
age, education, past work experience and RFC, there were a
significant number of jobs in the national economy which

18

plaintiff could perform, including the jobs of a janitor and a clerk. (R. 26).

## C. **Plaintiff's Arguments in Support of Summary Judgment**

Plaintiff raises two arguments in support of his motion for summary judgment.[12]  Initially, plaintiff asserts that the ALJ erred at step three of the sequential evaluation process when he failed to find that plaintiff met a listed neurological impairment.  In the event the Court is not persuaded by this argument, plaintiff argues alternatively that the ALJ erred at step five of the sequential evaluation process by relying on the VE's testimony to show that there are other jobs existing in significant numbers in the national economy which he could perform.

i

With respect to plaintiff's argument concerning the ALJ's finding at step three of the sequential evaluation process, as

_____

[12]In the brief filed in support of his motion for summary judgment, plaintiff notes that on July 1, 2005, he was awarded DIB as of August 14, 2004, the day after the ALJ's adverse decision in this case, and he asserts that the subsequent award was based on the identical record that was before the ALJ in this case.  (Document No. 12, p. 9).  In response, the Commissioner notes the lack of proof regarding plaintiff's assertion that the subsequent award was based on the same evidence that was before the ALJ in this case, and the Commissioner asserts, correctly, that the subsequent award of DIB which is attached to plaintiff's brief as Exhibit A, cannot be considered by the Court in assessing whether the ALJ's decision in this case is supported by substantial evidence.  (Document No. 14, pp. 15-16, n.7).

19

noted previously, the ALJ found that plaintiff did not meet the requirements of any neurological impairment listed in Section 11.00 of Part 404, Subpart P, Appendix 1 of the Social Security Regulations, and, "in particular, part B of listing 11.05, Central nervous system vascular accident."[13]  (R. 24-25). Plaintiff maintains that the ALJ applied the wrong listing in this case.  Specifically, plaintiff claims that he has never taken the position that he suffered a vascular accident which, in fact, is Listing 11.04, not Listing 11.05 as cited by the ALJ. Rather, plaintiff claims that he meets "Part C of listing 11.00." (Document No. 12, p. 6).

With respect to plaintiff's argument regarding the ALJ's application of the criteria set forth in Listing 11.04 in this case, the Court agrees with the Commissioner that the ALJ properly evaluated the effects of plaintiff's brain stem angioma under Listing 11.05 relating to benign brain tumors, because Listing 11.05 directs the evaluation of such an impairment under

---

[13]The Listing of Impairments in Part 404, Subpart P, Appendix 1 of the Social Security Regulations describes for each of the major body systems impairments that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education or work experience.  *See* 20 C.F.R. § 404.1525(a).  "For a claimant to show his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *See* Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir.2004), *quoting*, Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

other listings, including Listing 11.04 which relates to central nervous system vascular accidents (Document No. 14, p. 10).[14] Thus, the fact that plaintiff is not claiming a neurological impairment based on a vascular accident is irrelevant. In addition, the Court concludes that the ALJ properly determined that plaintiff failed to meet the criteria of Listing 11.05. Simply put, there is no evidence in the record to support a finding that plaintiff's impairment has resulted in ineffective speech or communication (Part A of Listing 11.04) or significant and persistent disorganization of motor function in two extremities (Part B of Listing 11.04).

---

[14]Listings 11.04 and 11.05 provide:

\*    \*    \*

11.04 *Central nervous system vascular accident.* With one of the following more than 3 months post-vascular accident:

A. Sensory or motor aphasia resulting in ineffective speech or communication; or

B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

11.05 *Benign brain tumors.* Evaluate under 11.02 [convulsive epilepsy], 11.03 [non-convulsive epilepsy], 11.04, or the criteria of the affected body system.

\*    \*    \*

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.04 and 11.05.

21

Turning to plaintiff's claim that he meets "Part C of

listing 11.00," this section of Part 404, Subpart P, Appendix 1

of the Social Security Regulations provides:

11.00   NEUROLOGICAL

\*   \*   \*

   C. *Persistent disorganization of motor function* in the
form of paresis or paralysis, tremor or other involuntary
movements, ataxia and sensory disturbances (any or all of
which may be due to cerebral, cerebellar, brain stem, spinal
cord, or peripheral nerve dysfunction) which occur singly or
in various combinations, frequently provides the sole or
partial basis for decision in cases of neurological
impairment.   The assessment of impairment depends on the
degree of interference with locomotion and/or interference
with the use of fingers, hands, and arms.

\*   \*   \*

As noted by the Commissioner, this section of the Social Security

Regulations "is neither a listing nor listing criteria but,

rather, a definitional section dealing with persistent

disorganization of motor function (which Plaintiff does not

have)."   (Document No. 14, pp. 10-11).   Accordingly, plaintiff's

reliance on this section to support his argument that the ALJ

erred in failing to find that he met a listed neurological

impairment at step three of the sequential evaluation process is

misplaced.

ii

   Alternatively, plaintiff argues that the ALJ failed to meet

his burden of showing that plaintiff could perform other jobs

22

existing in significant numbers in the national economy at step

five of the sequential evaluation process. Specifically,

plaintiff contends that the hypothetical questions posed by the

ALJ to the VE were deficient because the questions failed to take

into consideration all of the symptoms caused by his brain stem

angioma. Thus, the ALJ's determination that he could perform

work existing in significant numbers in the national economy

based on the VE's testimony is not supported by substantial

evidence. *See, e.g.*, Ramirez v. Barnhart, 372 F.3d 546, 552 (3d

Cir.2004) (If an ALJ poses a hypothetical question to a VE that

fails to reflect all of a Social Security disability claimant's

impairments that are supported by the record, the VE's opinion

cannot be considered substantial evidence supporting the grant of

summary judgment to the Commissioner). After consideration, the

Court is persuaded by plaintiff's alternative argument.

First, the ALJ asked the VE whether there were any

unskilled, entry level occupations that an individual of

plaintiff's age, education and work history who is able to

perform work at any exertional level which does not involve

exposure to hazards, such as heights and dangerous machinery, or

driving could perform. The VE answered affirmatively, citing the

jobs of a janitor and a clerk. The ALJ then asked the VE if the

individual could perform the job of a janitor if he or she

suffered "brief losses of awareness or even consciousness... I

23

don't mean falling down but lapses in awareness that occurred 10 to 15 times a week and lasted each of them for a period of a second or two up to 30 seconds." Again, the VE answered affirmatively, indicating that "[t]heoretically, it would have no affect on the individual's ability to perform the job."

As noted by plaintiff, however, the ALJ failed to pose a hypothetical question to the VE which included plaintiff's well-documented symptoms of intermittent double vision (R. 18, 94, 97, 255, 278, 283, 284, 299) and constant spatial disorientation (R. 18, 94, 255, 295), as well as the brief losses of consciousness. Moreover, although the ALJ pursued the issue of the number of absences an employer would tolerate on a monthly basis and the VE testified that an absence of one day per month on a regular basis "would likely bring the individual into difficulty," he never addressed Major Jackson's statement regarding plaintiff's Medical Evaluation Board while he was still a member of the United States Air Force in which she specifically noted that plaintiff missed "numerous days" of work as a result of his medical condition.[15] Under the circumstances, this matter will be remanded to the Commissioner for the purpose of obtaining additional VE

_____

[15]In this connection, the Court notes that when plaintiff's counsel asked the VE if an individual who missed substantial time from work because of blackouts, double vision and spatial disorientation would be employable, the VE responded: "In my opinion, no." (R. 331).

testimony.   Specifically, on remand, the ALJ is to elicit a VE's opinion regarding plaintiff's ability to engage in competitive employment on a sustained basis in light of all the well-documented symptoms he experiences as a result of his brain stem angioma.

William L. Standish
United States District Judge

Date: October 30, 2006

25